IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**KURT M. HAHN,**                                        Case No. 3:17 CV 897

    Plaintiff,

    v.                                                 Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                                         MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Kurt M. Hahn ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 19). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff filed for SSI on November 5, 2014, alleging a disability onset date of January 1, 1986[1]. (Tr. 253). His claims were denied initially and upon reconsideration. (Tr. 173, 180, 188, 195). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 13). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on July 15, 2016. (Tr. 46-100). On October 5, 2016, the ALJ found Plaintiff not disabled in a

---

1. Plaintiff later amended his alleged onset date to November 5, 2014—the date of his application—and withdrew the claim he had contemporaneously filed claim for disability insurance benefits. (Tr. 17, 55, 291).

written decision. (Tr. 17-38). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); *see* 20 C.F.R. §§ 416.1455, 416.1481. Plaintiff timely filed the instant action on April 28, 2017. (Doc. 1).

## FACTUAL BACKGROUND

<u>Personal Background and Testimony</u>

Plaintiff was born in December 1976, making him 37 years old on the alleged onset date and the date of his application. (Tr. 57). He had a tenth grade education. (Tr. 346). Plaintiff lived in a single-story home with his mother and fifteen year old son. (Tr. 58). He had a driver's license, and drove a few times a week to doctor's appointments or the grocery store. (Tr. 59). He had past work in a tractor-trailer detail shop. (Tr. 62).

Around the house, Plaintiff washed dishes, vacuumed, and played video games with his son. (Tr. 65-66, 80-82, 84). He went to the movies, and picked up his son from camp. (Tr. 82). He went grocery shopping and sometimes cooked meals for the family (Tr. 74). Plaintiff could play video games for approximately an hour before experiencing pain in his fingers. (Tr. 82). In his spare time, Plaintiff enjoyed reading news magazines, and fishing. (Tr. 62, 85). He went fishing one week before the hearing. (Tr. 85). Plaintiff also cared for his dog by taking it outside on a leash, and playing in the yard. *Id.*

Plaintiff used a walker for balance for the year prior to the hearing. (Tr. 67). He fell getting out of bed without his walker two days prior to the hearing. (Tr. 68). Plaintiff testified he took Doxepin daily (Tr. 76), and previously received injections in his back (Tr. 78). He smoked marijuana daily to ease his pain. (Tr. 81).

Plaintiff had a lumbar spine CT Scan on August 21, 2014. (Tr. 488). It showed nodes along the inferior endplates of T11 and T12. *Id*. No compression fractures were seen, but there was evidence of degenerative disc disease at L4 and L5 with some mild loss of disc space. *Id*. There was more advanced evidence of degenerative disc disease from L5 to S1. (Tr. 489). No spinal stenosis or other lesions were present. *Id*.

Two days prior to his alleged onset date, Plaintiff underwent a physical therapy evaluation for low back pain. (Tr. 1205-09). On November 5, 2014 (the amended alleged onset date), Plaintiff reported to his physical therapist Thomas Zuver Jr., P.T., that he went to the gym the previous evening and was sore after doing 250 sit-ups, lifting weights, and walking on a treadmill. (Tr. 1210). Plaintiff estimated his lower back pain was an eight out of ten. *Id*. Plaintiff missed physical therapy appointments on November 7 and 10 (Tr. 1212-13), and attended appointments on November 14, 17, and 18 (Tr. 1214-19). On December 10, 2014, Mr. Zuver discharged Plaintiff's inactive file noting "[t]here [were] no completed visits since 11/18/2014". (Tr. 1221).

On November 19, 2014, Plaintiff saw nurse practitioner Amber Thomas, CNP, at his family physician's office for a follow-up on back pain. (Tr. 608). Plaintiff reported numbness on the left side of the upper leg, and on his right arm from the elbow to fingertips. *Id*. Plaintiff reported physical therapy and pain cream were working well, and that he continued exercising at home in

---

2. The medical record in this case is voluminous, and both Plaintiff and the Commissioner reference only limited portions of it. Pursuant to this Court's initial order, "**[a]ll facts relevant to the legal issues and discussion must be set forth in the "Facts" section**" and "**[a]ny factual assertions or arguments relying upon the record that either do not cite to the record or are unsupported by the record citation will not be considered by the Court.**" (Doc. 7, at 3) (emphasis in original). Thus, the undersigned summarizes those portions of the record cited by the parties.

addition to therapy. *Id*. Ms. Thomas's examination revealed a normal gait, no joint swelling, and normal movements of all extremities. (Tr. 609).

In January 2015, Plaintiff went to the emergency room for toe pain. (Tr. 647). Plaintiff reported bilateral neuropathic pain in all ten toes, and noted Percocet and OxyContin did not help. *Id*. On examination, Plaintiff had normal range of motion in the toes without tenderness. (Tr. 648). He had normal muscle strength. *Id*. The emergency room physician diagnosed bilateral toe pain. *Id*.

Plaintiff saw Everett Ferradino, M.D., later in January 2015. (Tr. 714). He complained of tingling and pain in both feet. *Id*. On examination, Plaintiff had decreased sensation to light touch. (Tr. 715). He had pain with light touch, and normal muscle strength. *Id*. Dr. Ferradino assessed peripheral neuropathy and prescribed Gabapentin. *Id.*

Plaintiff received treatment from podiatrist David Witt, D.P.M., from February through November 2015. (Tr. 643, 709-10, 855-56, 1148). Treatments included creams and debridement for calluses, as well as Neurontin and Percocet for foot pain. *Id*.

In February 2015, Plaintiff saw psychologist James Kelly, M.Ed., for a consultative examination. (Tr. 735-44). Plaintiff reported a depressed mood, developmental handicap, and mood swings. (Tr. 736). A mental status examination revealed Plaintiff was cooperative and motivated with no eccentricities of manner or impulsivity. (Tr. 738). He had normal, goal directed conversation, with appropriate articulation. *Id*. Plaintiff described his mood as "off and on", but did not express feelings of guilt, hopelessness, or worthlessness. *Id*. His judgment was "reasonably sufficient to make important decisions affecting his future, conduct his own living arrangements and independently manage his own funds". (Tr. 740). Dr. Kelly noted Plaintiff's depression was "supported by his report of a low mood" and "improved with medication". (Tr. 741).

Plaintiff began treatment at a pain management center in April 2015. (Tr. 759). He reported foot pain, bilateral leg pain, and midline lumbar pain. *Id*. Plaintiff reported taking a friend's opiates the night before, and smoking marijuana to help him sleep. *Id*. On examination, Plaintiff had intact sensation, normal reflexes, no muscle spasms, intact gait with no mobility aids, and negative straight leg raise testing. (Tr. 761). A CT scan of the lumbar spine revealed a L5-S1 disc bulge. (Tr. 764). At an appointment later in April 2015, Plaintiff reported he continued to take medications that came from a friend. (Tr. 765, 767-68). On examination, Plaintiff continued to have intact gait, negative straight leg raises, and presented no new neurological symptoms. (Tr. 765-67).

A May 2015 electromyography ("EMG") showed sensory motor neuropathy with no underlying lumbosacral radiculopathy. (Tr. 1139-40).

In September 2015, Plaintiff underwent a nerve study and EMG. (Tr. 929). The nerve conduction findings were abnormal, with no sural sensory responses in both feet, and "very slow" conduction velocities with severely prolonged F response latency. *Id*. The EMG showed abnormal nerve conduction. *Id*. The results were found to be consistent with peripheral polyneuropathy with primarily demyelinating features. *Id*. Later in September 2015, Plaintiff reported improvement with medication, and walked without assistance, with a normal, steady gait. (Tr. 1112-13).

In October 2015, Plaintiff had a neurological examination with Mark Loomus, M.D. (Tr. 1145). Dr. Loomus found Plaintiff had normal muscle tone, motor strength, and no obvious weaknesses. *Id*. He assessed neuropathy, myelopathy, and cervical spine stenosis. (Tr. 1144). In December 2015, Dr. Loomus found Plaintiff exhibited normal motor strength, no obvious weakness, normal gait, intact heel walking, intact sensation to light touch, and decreased pinprick

and temperature sensation in the lower extremities. (Tr. 1146). Dr. Loomus assessed neuropathy, cervical spondylosis, and lumbar disc degeneration. *Id.*

<u>Opinion Evidence</u>

*Treating Source*

In January 2015, Jeanne Jagodzinski, PMHNP[3], completed a Mental Capacity Assessment. (Tr. 636-37). In it, she opined Plaintiff had a slight limitation in his ability to make simple, work-related decisions; maintain awareness of workplace hazards; get along with co-workers; and maintain socially appropriate behavior. (Tr. 636). He had a moderate limitation in his ability to work in coordination with others; complete a normal workday without interference from psychologically based symptoms; perform at a consistent pace; ask simple questions; interact with the public; respond to criticism; adapt to changes in the workplace; travel; or set realistic goals. (Tr. 636-37). Ms. Jagodzinski opined Plaintiff would be absent from work approximately four times per month. (Tr. 636). In support of these findings, Ms. Jagodzinski noted Plaintiff experienced issues with decreased energy and, "experience[d] anxiety with new situations . . . which limit[ed] his ability to consistently perform tasks and complete tasks." *Id.*

*Examining Physician*

After the February 2015 consultative examination, Dr. Kelly opined Plaintiff had below average cognitive functioning, but could "understand and apply instructions in the work setting consistent with below average intellectual functioning". (Tr. 742). He noted Plaintiff had the ability to maintain concentration, relate in a friendly manner, and could respond appropriately to supervision and coworkers in a work setting. *Id.* Dr. Kelly found Plaintiff's low mood might be a

---

3. PMHNP stands for Psychiatric Mental Health Nurse Practitioner.

limiting factor, but otherwise found he could respond appropriately psychologically to normal workplace pressures. *Id*.

*Reviewing Physicians*

In February 2015, state agency physician Esderado Villianueva, M.D., reviewed the medical evidence of record and opined Plaintiff could perform medium work with occasional climbing, and frequent stooping and kneeling. (Tr. 130). Plaintiff needed to avoid exposure to wetness and humidity, and concentrated exposure to respiratory irritants. *Id*. He needed to avoid all exposure to hazards such as machinery or heights. *Id*. In June 2015, Gerald Klyop, M.D., reviewed the medical evidence of record and concurred with Dr. Villianueva's findings. (Tr. 159-61).

In March 2015, state agency psychologist Leslie Rudy, Ph.D., reviewed the medical evidence of record. (Tr. 116-17). She opined Plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting, interact with the public, accept instructions and respond to criticism, get along with co-workers, and set realistic goals. *Id*. He was not significantly limited in his ability to ask simple questions, maintain socially appropriate behavior, maintain awareness of hazards, or travel. *Id*. In July 2015, state agency psychologist Vicki Warren, Ph.D., concurred with Dr. Rudy's findings. (Tr. 163-64).

VE Testimony

A VE appeared and testified at the hearing before the ALJ. *See* Tr. 91-96. The ALJ asked the VE to consider a person with Plaintiff's age, education, and vocational background who was physically and mentally limited in the way the ALJ determined Plaintiff was. (Tr. 92). The VE

opined such an individual could not perform Plaintiff's past work, but could perform other jobs such as a machine tender, folder, and packager. (Tr. 92-93).

ALJ Decision

The ALJ made the following findings of fact and conclusions of law in his October 5, 2016 decision:

1. The claimant has not engaged in substantial gainful activity since November 5, 2014, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

2. The claimant has the following severe impairments: obesity with BMI of 42.7, asthma, lumbar and cervical degenerative disc disease, peripheral neuropathy, and depression (20 CFR 404.1520(c) and 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except occasionally climb ramps and stairs, ladders, ropes, scaffolding; frequently stoop, kneel, crouch and crawl; avoid all exposure to wetness and humidity; avoid concentrated exposure to fumes, odors, dust, etc; avoid all exposure to hazards; understand, remember, and carry out simple instructions; perform simple, routine, and repetitive tasks, but not at a production rate pace such as an assembly line; adapt to routine changes in the workplace that are infrequent and easily explained; and interact occasionally with supervisors, coworkers, and the general public.

5. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

6. The claimant was born [i]n December . . .1976 and was 9 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).[4]

_____

4. The ALJ appears to use the original alleged onset date (January 1, 1986), rather than the amended one in calculating Plaintiff's age. However, the ALJ identified the correct age category (18-49) despite misidentifying the age on the alleged onset date. Plaintiff was 37 years old on his amended alleged onset date.

7. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

8. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR Part 404.1568 and 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 1986, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 20-37).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

**STANDARD FOR DISABILITY**

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and

meets the duration requirements, is he determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff argues the ALJ: 1) failed to properly evaluate the medical opinion evidence (Doc. 14, at 6-7); and 2) erred at Step Five in his analysis, because the jobs identified require abilities in conflict with the RFC, *id*. at 10. The Commissioner responds that the ALJ did not err and his decision is supported by substantial evidence. For the reasons discussed below, the undersigned affirms the decision of the Commissioner.

Medical Opinion Evaluation

Plaintiff first argues the ALJ failed to properly evaluate the opinion of Ms. Jagodzinski, his treating nurse practitioner, and incorrectly relied on the opinions of the state agency physicians. (Doc. 14, at 6). The Commissioner responds that the ALJ's findings are supported by substantial evidence. (Doc. 16, at 9). For the reasons discussed below, the undersigned agrees with the Commissioner and affirms the decision.

*Ms. Jagodzinski*

As an initial matter, under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 416.902. An "acceptable medical source" includes "licensed physicians" and "licensed or certified psychologists." 20 C.F.R. § 416.913 (a)(1)-(2). Evidence from those who are "not acceptable medical sources" or "other sources", including nurse practitioners, "are important and should be evaluated with key issues such as impairment severity and functional effects, along with other relevant evidence in the file." SSR 06-03, 2006 WL 2329939, at *2. Interpreting SSR

06-03, the Sixth Circuit found that "[o]pinions from non-medical sources who have seen the [Plaintiff] in their professional capacity should be evaluated by using the applicable factors, including how long the source has known the individual, how consistent the opinion in with other evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). A treating nurse practitioner is not afforded the same deference as a treating physician, nor does the ALJ have to follow the "good reasons" requirement with regard to her opinion. *See* SSR 06-03p, 2006 WL 2329939, at *2; *Leach v. Comm'r of Soc. Sec.*, 2015 WL 1221925, at *3 (N.D. Ohio).

In his analysis, the ALJ summarized the opinion of Ms. Jagodzinski and gave reasons for the weight assigned:

> I also considered the January 23, 2015 medical source statement by the nurse, Jeanne Jagodzinski, indicating the claimant had slight to moderate difficulties in understanding and remembering, slight to moderate difficulties in sustained concentration and persistence, slight to moderate difficulties in sustained concentration and persistence, and slight to moderate difficulties in social interaction and adaptation. As discussed above, the record did not support more than moderate difficulties consistent with the findings in the consultative examination, numerous normal mental status examinations in treating records, and the claimant's activities and functioning in the record. Thus, the up to moderate limitations portion of the opinion is given favorable weight. However, the portion of the opinion that the claimant would likely miss four days a work [sic] was not supported by any objective findings in the record (Exhibit 16F). The claimant [was] able to perform some work activity in the past earning almost $11,000 in one year (Exhibit 5D). The objective record did not reveal the presence of mental or physical limitations to support the claimant would be absent four days per month. Thus, this portion of the opinion is given little weight.

(Tr. 35).

Plaintiff argues the ALJ improperly rejected Ms. Jagodzinski's opinion that he would likely be absent from work four or more times per month. (Doc. 14, at 8). As noted above, the ALJ gave "little weight" to this finding because it was not supported by objective findings in the record, including the presence of any mental or physical limitations that would support the finding. (Tr.

35). For example, the ALJ recognized Plaintiff had "some brief mental health therapy" and was prescribed psychotropic medications from Ms. Jagodzinski, however, the medication was not prescribed long term, Plaintiff was no longer receiving any therapy, and no in-patient hospitalization was required. (Tr. 32) (citing Tr. 741-42). The ALJ also pointed to the consultative psychological examiner Dr. Kelly, who opined Plaintiff could respond in an appropriate way to normal pressures of the workplace, and had no history of mental or emotional issues in response to such pressures. (Tr. 33) (citing Tr. 742). Further, Dr. Kelly opined Plaintiff had an average ability to maintain concentration, relate in a friendly manner, and could understand and apply instructions in a workplace setting consistent with below-average intellectual functioning. (Tr. 742). Dr. Kelly did not assess the need for Plaintiff to miss any work days due to mental limitations. (Tr. 741-42). Thus, the undersigned finds the lack of objective findings in the record is a supported reason for rejecting the absenteeism limitation here.

In addition to the medical record evidence, the ALJ noted Plaintiff was able to perform some work activity in the past, earning nearly $11,000 in one year, as a reason to discount Ms. Jagodzinski's absenteeism opinion. (Tr. 35) (citing Tr. 290). Plaintiff argues this does not constitute substantial evidence that Plaintiff would not miss work four or more days per month. (Doc. 14, at 8-9). Plaintiff is correct here – his ability to work and earn income from 1993 to 2008, as outlined in the earnings summary report, does not speak to whether he would miss work due to mental limitations from his November 2014 onset date to the date of the ALJ's decision. (Tr. 290). Thus, the undersigned finds this particular reason unsupported.

However, it is important to note, the ALJ did not limit his analysis of Ms. Jagodzinski's opinion to this single piece of evidence – he considered it as *one* factor among many when he evaluated her opinion. *See* SSR 06-03, 2006 WL 2329939, at *2. The ALJ properly rejected such

a severe absenteeism limitation by demonstrating that the above-listed medical evidence of record fails to support such an estimate. (Tr. 35); *Saulic v. Colvin*, 2013 WL 5234243 at *10 (N.D. Ohio) ("Here, the ALJ evaluated the medical evidence and hearing testimony, and provided sufficient explanation for his implicit rejection of Dr. Dankoff's opinion regarding Saulic's expected work absences."). Thus, even discounting the ALJ's reliance on Plaintiff's earnings, the undersigned finds the ALJ's rejection of Ms. Jagodzinski's opinion on absenteeism is supported by substantial evidence and affirms the decision of the Commissioner.

*Reviewing Physicians*

Plaintiff also argues the ALJ erred when he accorded a portion of the non-examining state agency physician's opinions "little weight" and another "great weight". (Doc. 14, at 6). Specifically, Plaintiff contends the ALJ erred in relying on non-examining physicians who did not review substantial, material evidence in the record, and the ALJ improperly "played doctor" by interpreting raw medical data. *Id*. The Commissioner responds that the ALJ decision is supported by substantial evidence.

"[T]he opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight." *Douglas v. Comm'r of Soc. Sec.*, 832 F. Supp. 2d 813, 823-24 (S.D. Ohio 2011). This is because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." *Id.*; § 416.927(c), (d); SSR 96–6p, 1996 WL 374180, at *2–3. "Consequently, opinions of . . . record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization." *Douglas,* 832 F. Supp. 2d at 823-24.

Here, the ALJ analyzed the state agency physician's opinions and assigned weight to each based upon several factors:

> The State agency medical consultants in a physical residual functional capacity assessment determined the [Plaintiff] could perform a range of work at the medium exertional level with occasionally climbing; frequently stooping and kneeling; avoid even moderate exposure to wetness and humidity; avoid concentrated exposure to respiratory irritants; and all exposure to hazards such as machinery and heights (Exhibit 6A). The reduced postural activity, environmental, respiratory, and hazard limitations are reasonable with the [Plaintiff's] spinal degeneration, obesity, neuropathy, lower extremity symptoms, and use of medications. However, the combination and severity of these impairments revealed in the objective record supported a further reduction of light work. Thus, the medium exertional portion of this determination is given little weight and the remainder of the opinion is given great weight.

> The State agency psychological medical consultants determined the [Plaintiff] had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of an extended duration (Exhibit 6A). As discussed above, the record did not support any additional limitations. The consultants determined these moderate difficulties and some diminished cognitive processes limited the [Plaintiff] to understanding and remembering 1-4 step tasks without demands for fast pace with the ability to adapt to occasional changes in a relatively static setting. Additionally, the [Plaintiff] was able to interact on an occasional and superficial basis (Exhibit 6A). These limitations were reasonable with his moderate limitations but in further considering the [Plaintiff's] subjective complaints and the examination findings from the consultative mental status examination supported slightly greater limitations. In fully considering the [Plaintiff's] complaints, education history and performance, below average intellectual functioning, and the findings from the consultative examination supported limiting Plaintiff to simple, routine, and repetitive tasks but not at a production rate pace such as an assembly line; adapt to routine changes in the workplace that are infrequent and easily explained. The Plaintiff's complaints of [] some difficulty talking to others, taking instructions, and preference to work more independent supported only occasional[] contact with supervisors, coworkers, and the general public.

(Tr. 34).

At the outset, it is important to note that, in the RFC assessment, the ALJ determined Plaintiff was actually *more* limited physically than the state agency consultants opined, finding "the combination and severity of the[] impairments revealed in the objective record supported a

further reduction of light work". (Tr. 34) (citing Tr. 160-61). This diverges from the state agency physicians' opinions that Plaintiff could only perform medium work (Tr. 160-63). Further, the ALJ also determined Plaintiff was *more* limited mentally than the state agency consultants opined. (Tr. 34). He found the state agency consultant's limitations were reasonable, but "further considering the [Plaintiff's] subjective complaints and the examination findings from the consultative mental status examination supported slightly greater limitations." *Id.*

Plaintiff argues the ALJ improperly relied on outdated state agency physician opinions in making his determination. (Doc. 14, at 6). Specifically, Plaintiff points out that these physicians did not review substantial portions of the record. *Id*. In support, Plaintiff raises a *Deskin* argument in his Reply. (Doc. 17, at 2) (citing *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008)). The district court in *Deskin* explained that "as a general rule, where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated nonexamining Agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing." *Id.* Further, the court explained, "the ALJ may not interpret raw medical data in functional terms." *Id.* However, *Deskin* also provided that "[a] medical source may not be necessary in every case", *id.*, and other courts have noted *Deskin* has been "criticized by other judges within this District", *Adams v. Colvin*, 2015 WL 4661512, at *15 (N.D. Ohio). Specifically, in *Henderson v. Comm'r of Soc. Sec.*, 2010 WL 750222 at *2 (N.D. Ohio), the court found that "Deskin . . . is not representative of the law established by the legislature, and interpreted by the Sixth Circuit Court of Appeals." Specifically, it is not error for an ALJ to rely on medical opinions from physicians who have not reviewed the entire record so long as the ALJ considers the post-dated evidence in formulating his opinion. *See, e.g., McGrew*

*v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (indicating that an ALJ's reliance upon state agency reviewing physicians' opinions that were outdated was not error where the ALJ considered the evidence developed post-dating those opinions).

Here, the ALJ examined post-dated evidence as required. For example, he recognized that, in September 2015, Plaintiff had neuropathy issues which were supported by objective testing (EMG). (Tr. 34) (citing Tr. 929) (September 2015 EMG that revealed abnormal nerve conduction findings in his feet). Later in September 2015, Plaintiff reported improvement with medication, and walked without assistance, with a normal, steady gait. (Tr. 1112-13). The ALJ noted, in October 2015, Dr. Loomus found Plaintiff had normal muscle tone, motor strength, and no obvious weaknesses. (Tr. 30) (citing Tr. 1148). Further, at a December 2015 exam, Dr. Loomus found Plaintiff exhibited normal motor strength, no obvious weakness, normal gait, intact heel walking, intact sensation to light touch, and decreased pinprick and temperature sensation in the lower extremities. (Tr. 31) (citing Tr. 1146). Thus, the ALJ did not improperly "play doctor" and interpret raw medical data in functional terms, but instead acknowledged the raw medical data, and noted other portions of the record demonstrating Plaintiff's remaining functionality. As noted above, an ALJ may rely on an outdated state agency physician's opinion in formulating the RFC, when he also reviews evidence which post-dates the opinion. *McGrew*, 343 F. App'x at 32. Ultimately, the RFC is the ALJ's determination – not a particular physician's. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004); SSR 96–5p, 1996 WL 374183, SSR 96–8p, 1996 WL 374184 at *1.

Thus, the ALJ properly considered the opinions of the state agency physicians and the undersigned finds no error in the weight the ALJ assigned.

*Step Five*

Plaintiff alleges the ALJ erred at Step Five, in finding Plaintiff could perform the jobs of machine tender and packager, because these jobs require abilities that conflict with the RFC. (Doc. 14, at 10). Specifically, Plaintiff correctly notes that the jobs identified require a "Reasoning Level 2" (which requires the ability to carry out detailed instructions) under the Dictionary of Occupational Titles ("DOT") descriptions. *Id.* He contends this conflicts with the ALJ limiting Plaintiff to simple instructions. *Id.* The Commissioner responds that the ALJ properly found Plaintiff could perform these jobs identified by the VE. (Doc. 16, at 14). For the reasons discussed below, the undersigned finds the ALJ did not err at Step Five, and affirms the decision of the Commissioner.

At Step Five, the ALJ must make a finding "supported by substantial evidence that [Plaintiff] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (internal quotation and citation omitted). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question." *Id.* If an ALJ relies on the VE's testimony in response to a hypothetical, that hypothetical must accurately portray the claimant's limitations. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-17 (6th Cir. 2010).

One of the most common tools utilized by VEs during testimony is the DOT, which is a list of "maximum requirements of occupations as generally performed," however a VE "may be able to provide more specific information about jobs or occupations than the DOT." SSR 00-4p, 2000 WL 1898704, at *2. Indeed, a VE has the ability to craft his answer in response to an individualized hypothetical RFC with potential limitations unforeseen by the DOT. *See Beinlich v. Comm'r of Soc. Sec.*, 345 F. App'x 163, 168 (6th Cir. 2009) ("[An] ALJ may choose to rely on

the VE's testimony in complex cases, given the VE's ability to tailor her finding to an 'individual's particular residual functional capacity.'"). "[N]either the DOT nor [the expert's testimony] automatically trumps when there is a conflict." SSR 00-4p, 2000 WL 1898704, at *2.

Social Security Ruling 00-4p provides that an ALJ must elicit a reasonable explanation from a VE when there is an apparent conflict between the VE's testimony and the DOT:

> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an *apparent unresolved conflict* between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

2000 WL 1898704, at *2 (emphasis added).

The ALJ has an affirmative responsibility to "inquire, on the record, as to whether or not there is [] inconsistency" between the VE's testimony and the DOT." *Id.* Beyond this initial inquiry, however, the Sixth Circuit has held the ALJ is under no obligation to further investigate the accuracy of a VE's testimony "especially when the claimant fails to bring any conflict to the attention of the [ALJ]." *Ledford v. Astrue*, 311 F. App'x 746, 757 (6th Cir. 2008); *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009); *see also Beinlich*, 345 F. App'x at 168. "Absent an objection to the vocational expert's testimony, [an] ALJ reasonably relie[s] on the testimony." *Staymate v. Comm'r of Soc. Sec.*, 681 F. App'x 462, 468 (6th Cir. 2017) (citing *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 269, 374 (6th Cir. 2006) ("Nothing in SSR 00-4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct.")).

Further, many courts within the Northern District of Ohio have "upheld ALJ Step Five determinations despite an actual conflict between the RFC and DOT where the ALJ inquired about

conflicts, conflicts were not brought to the ALJ's attention, and the VE testified that no conflicts existed." *Cross v. Comm'r of Soc. Sec.*, 2017 WL 2684426, at *5 (N.D. Ohio) (collecting cases), *report and recommendation adopted by* 2017 WL 2671089. In *Cross*, after surveying numerous cases from the Sixth Circuit and Northern District of Ohio, the court concluded it was not reversible error for an ALJ to rely on a VE's testimony regarding certain jobs where the ALJ inquired of the VE whether the jobs were consistent with the DOT, and the VE said they were, even where the plaintiff later pointed out the three jobs required moderate noise exposure, which the ALJ's RFC precluded. *Id.* at *5-6.

During the hearing in this case, the ALJ asked the VE a hypothetical question that identified an individual who could, *inter alia*, understand, remember, and carry out simple instructions. (Tr. 92). The VE identified three light, unskilled jobs that the individual could perform: machine tender, folder, and packager. (Tr. 92-93). The ALJ then asked the VE if the testimony he provided was "consistent with the information found in the Dictionary of Occupational Titles and the SCO". (Tr. 95). The VE replied that it was, but noted the DOT did not address issues he considered involving assistive devices or absenteeism. *Id.* Plaintiff's counsel did not object to this testimony, and the ALJ was under no further obligation to seek out conflicts absent an objection. *See Staymate*, 681 F. App'x at 468; *Martin*, 170 F. App'x at 374.

Moreover, it is not clear there is a conflict. Plaintiff argues the jobs identified by the VE require a Reasoning Level 2 (which requires the ability to carry out detailed instructions) under the DOT, and as such, conflict with the ALJ limiting Plaintiff to carry out simple instructions. (Doc. 14, at 10). However, Plaintiff does not cite any authority for the proposition that jobs requiring Reasoning Level 2 are inconsistent with a limitation to simple instructions. This argument is not well-taken. Relying on *Monateri v. Commissioner of Social Security*, 436 F. App'x

434, 446 (6th Cir. 2011), another judge in this district held that "a claimant's limitation to simple one-or-two step instructions and simple routine tasks was not inconsistent with the ability to perform jobs with the requirement of Reasoning Level 2." *Poll v. Berryhill*, 2017 WL 3731988, at *7 (N.D. Ohio); s*ee also Russell v. Comm'r of Soc. Sec.*, 2014 WL 1333262, *3 (N.D. Ohio) (holding that an ALJ limiting Plaintiff to simple one-to-two step instructions and routine tasks, without quota productions, is not inconsistent with the ability to perform jobs at Reasoning Level 2). Further, the regulations do not obligate the ALJ and consulting VE to rely on the DOT's classifications, *Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003), and there is no precedent within the Sixth Circuit that "requires the Commissioner to align DOT reasoning levels with RFC classifications", *Monateri*, 436 F. App'x at 446.

Here, the ALJ has fulfilled his obligation under SSR 00-4p. He inquired, as required, and had no obligation to investigate further. *Lindsley*, 560 F.3d at 606; *Martin*, 170 F. App'x at 374; *Beinlich*, 345 F. App'x at 168. Plaintiff's counsel did not object to the VE's testimony, or inquire further about any conflicts. *See* Tr. 95-96. Thus, the ALJ reasonably relied on the VE's unchallenged testimony to satisfy his burden at Step Five because "the conflict was no more apparent to the ALJ than in the numerous cases from this court cited above." *Cross*, 2017 WL 2684426, at *6. As such, the undersigned finds no error in the ALJ's decision.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI supported by substantial evidence and affirms that decision.

  s/James R. Knepp II
United States Magistrate Judge